Case number 22-5981, Teamsters LCL 237 Welfare Fund v. ServiceMaster Global Holdings, Inc. at all, or arguments not to exceed 15 minutes per side. Mr. Douglas Willans for the appellant. May it please the court, my name is Doug Willans. I represent the Teamsters LCL 237 Welfare Fund. With the court's permission, I'd request three minutes for rebuttal time. That's fine. Thank you. This is a securities fraud action against ServiceMaster, a company that provides termite and other pest control services under its Terminix brand. The district court erred in dismissing plaintiff's complaint on Sientra grounds. While the court repeatedly found that plaintiff alleged that defendants knew or should have known about mounting legal claims for termite damages in the Alabama area, the court wrongly held that we failed to plead a strong inference of Sientra. Now the main reason why the court held that we failed to plead that strong inference was it found that there was a competing inference of non-culpable conduct arising from the transformation efforts that the company had undertaken prior to and during the class period. It's our position that that non-competing inference or that competing inference was implausible and not supported by the facts of the complaint. So you don't think the district court applied the wrong legal standard? You just think he applied the correct legal standard wrongly? Correct. Yes. The standard is when taking our allegations collectively and holistically, would a reasonable person deem the inference of Sientra cogent and more compelling than any competing inference? He stated the standard correctly. It's our position that he didn't consider the allegations collectively or holistically and he wrongly applied the standard in this case. The first reason being that, as I was saying, with the competing inference of Sientra that we found that Terminix had, I'm sorry, ServiceMaster had undertaken what they called this transformation effort. We say it's implausible and not supported by the facts of the complaint because when they discussed this transformation effort, it was aimed at, and it's undisputed, it was aimed at improving their customer service and retention. And what we say is that the steps that were taken in the Alabama area were the complete opposite of improving customer service and retention. The steps they took, for example, with respect to, so our allegation center around this, what we say is a super termite crisis plaguing the Alabama area. So we allege in the complaint how that crisis came about, how it manifested, that shoddy work led to a substantial increase in termite infestations in the Alabama region around the Gulf Coast. We allege that the resulting property damage from the termite infestations was substantial and led to a rising number of legal claims for termite damages. We allege how ServiceMaster handled the crisis and how they handled the surge of mounting legal claims by one... It seems to me, so there's two things going on, right? They essentially didn't disclose the true extent of their legal exposure for the termite damage and they attributed their price, their ability to raise price to a strong market rather than the scheme, I suppose, to drive customers out of the market, right? I mean, there are two main components to the allegation. Yeah, I mean, those are the false statements that the court led. One was the legal exposure. Two was the... I mean, there's a corollary to that, that they failed to disclose the trends and uncertainties required by SEC disclosure regulations, but... What are the allegations, though, specifically about their knowledge of the, I suppose, the true legal exposure? What is it? I just don't... I guess when I was looking at the complaint, it doesn't seem... I know there's some confidential witnesses and some other things, but I don't see any specific kind of... The legal department produced reports that showed there were 100 pending cases and that despite that, they accrued 2 million when they should have done 10 or whatever. I'll concede that we don't have that direct link, the direct link of evidence between... That leaks the individual defendant's knowledge. Our position is we don't have to. We don't have to produce the smoking gun type evidence that says, witness A spoke to defendant Vardy on this day and told him X, Y, and Z. It would be great if we had that. Again, we're at the pleading stage and that's information that we would expect to obtain through discovery, but you can plead a strong inference of scienter in this circuit and elsewhere through circumstantial evidence. What we have here is a very strong circumstantial evidence case where we have this years long problem that they've experienced in the Alabama area. We allege how it manifested, how they dealt with it, specifically, some of the things you said, your honor, is they reorganized all their branch offices. They denied valid claims for termite damage. They forced customers to pursue arbitration and then, I guess, they implemented a number of mitigating actions and operating changes. All of these were very intentional acts that they took and the most prominent of the mitigating actions was the price increases, that they were trying to drive customers out of the market so that they would sort of limit their claims. And again, that goes to my point about the competing inferences that... But the class period was what, from February to November of 2019? Correct. Twice during that period, during quarterly report, they increased the reserve for termites by $2 million twice during that period, didn't they? They did, but again, if you look at that disclosure, and the court itself found in its opinion that it was nonspecific. It didn't say anything about what was the real problems that were going on in the Alabama area. Well, it was actually Mobile, Alabama. Correct. Well, it was Mobile and the Gulf Coast area, but yes. It wasn't the whole state. I mean, it wasn't... No, you're correct. I mean, they acknowledged at the end of the class period that these claims were concentrated in the Mobile, Alabama area. I'm not suggesting... Let me ask you this. I mean, you're aware, I'm sure, of our case called Hellwig. Yes, I am. The Hellwig factors that are sort of indicia of Sienter. Well, I'm curious. It doesn't seem like most of these factors exist here. I mean, there's no evidence of bribery. There's no insider trading. There's no ancillary lawsuits that were quickly settled. There's no personal interest of certain directors. So what Hellwig factors do you have here that would infer Sienter? Before I answer that, I just would like to say that Hellwig was a pre-Tel-Labs case. So when we look at, again, how we evaluate Sienter in a post-Tel-Labs case, I'm not saying the Hellwig factors are not important. They certainly are. But what the Supreme Court said is you look at the collective and holistic facts together. And what that would mean is there may be some instances where cases don't fit neatly within those Hellwig factors. But to answer your question specifically, I mean, I think it's number six, the disregard for the most current facts that are contrary to what the company is saying. We allege temporal proximity. There's also the... I don't want to say... It references an ancillary litigation. We do have an ancillary investigation here that started prior to the class period extended that was resolved. That's the Alabama Attorney General. Correct. But that didn't get resolved until a year, full year later. True. But if you look at the press release that's in the record where they announced the $60 million settlement, what the AG said was, as soon as we presented our facts to the company, they settled for $60 million. So yes, the settlement occurred afterwards, but I would suggest at least there's some evidence of culpability in that, even though it occurred after the fact. You've got to show more, though, than just negligence or sloppiness or failure to realize how serious the termite problem was. You've got to show scienter, right? Correct. And it's our position that there's certainly no inference of negligence. A lot of what we're talking about here were intentional acts that the company took to conceal that there was this big termite problem in the Mobile, Alabama area. They told us at the end of the class period that this was a problem. They called it a legacy problem. So if you read our loss causation section, which lays out in October of 2019 and November of 2019 what the company specifically said, this is not a problem that came out of nowhere. It wasn't a small problem where, oh, there were a couple houses on the Gulf that really got bad termite damages. This was a massive problem. They took significant steps, and they took those steps in Alabama only. What they said at the end of the class period is, all of our other areas are operating at historical levels. So this was an Alabama problem, and where the court said, in our view, made a materiality decision that, well, this is a local Alabama problem, and it doesn't, I'd say the facts of the complaint and what they said at the end completely counter that. This was a big problem they had been monitoring for several years. If the individual defendants didn't know about it, and we suggest that they do, under a corporate scienter theory, we still have, there are individuals who implemented these intentional acts for one of implementing these price increases to get people to drop their contracts before they discovered that they even had the termite problems to begin with. Do you, I know we have a fair, we have a number of cases in this area, and obviously there are in other circuits. Do you have one or two that you think this one is most similar to, where a court has let the claim go forward? I think probably the strongest case in our favor is the second Frank Videna case. That was 2011. I know, Judge Gilman, you were on the first case, but you weren't on the second one. But that was, that's probably our strongest case. The recent Aztec case, A-S-T-E-C, that was decided in the past few years is also a very good case for us. But, you know, the case law is, you know, I'm not up here suggesting that scienter is easy to prove. But what you said in the, what the court said in the Aztec case is, it can't be insurmountable. We're still at the pleading stage. We've I mean, let's go to the price gouging issue. What are the allegations there that, okay, so he says on the call, you know, we can raise price because the market will bear it. You say that there was a strategy to raise price to decrease the number of customers. What is the allegation there that he knew that that was the strategy, I guess, when he was saying something completely different? Well, we say, you know, his statement, and the court found that his statement was misleading because it failed to disclose this Alabama issue. But it's the same type of allegations where we allege in 2018 that they implemented these pricing, you know, we have the, there's an allegation of complaint that Jeff Curtis, the direct, you know, now the national director of claim, I don't know if he is at the present, but at the time of the complaint, who testified in 2018, they implemented this procedure to raise price. Again, this wasn't a minor thing. They raised prices by 1,000% as the AG found. They acknowledged at the end of the class period that they had begun these mitigating activities in 2018 as they were facing, again, we have allegations of the complaint of, you know, such a glut of arbitrations. They had so many that they had scheduling problems throughout 2016, and that led to these multimillion dollar arbitration awards. So it's the AG, you know, it's all of the facts taken together. We don't have the smoking gun here. I fully acknowledge that, but we certainly have enough to survive this motion to dismiss. Thank you. Any other questions? Thank you. Thank you. On behalf of the Tallmen. I've never had that problem. Good morning. Good morning, Your Honors. Timothy Hoffner, McDermott, Will and Emery on behalf of appellees. Chief Judge Anderson wrote two very thoughtful and comprehensive opinions dismissing the claims in this case. We request that the court affirm the opinions for failure to plead scienter with the specificity required by the PSLRA and the TELL Labs decision and the Hellwig decision that's been discussed earlier today. Plaintiffs have the burden of pleading a claim, and I'm going to try to focus on a couple of the issues that came up in the questions here. A strong inference of scienter must be more than merely plausible or reasonable. It must be cogent and at least as compelling as any opposing inference of non-fraudulent intent. Since the burden of pleading is on plaintiff, defendant need not proffer a non-fraudulent explanation absent plaintiff articulating a cogent and strong inference of scienter. That's the die-balled opinion which Judge Gilman was smart enough to write. Here the court found the complaint alleged a plausible inference of scienter but found the inference was not strong. Then the court went the extra mile to find that the inference was no more plausible than the non-fraudulent explanations of the facts. The court's opinion needs to be read holistically. There's a several-page discussion about scienter. There are bits and pieces that my colleague seeks to draw out and focus on, but you need to look at that holistically and look at the entire discussion. As part of this analysis, the courts consider the Hellwig factors that you discussed. Hellwig is consistent with TELAB. It's consistent with the factors that have been identified in a number of cases that focus on indicators of scienter. They compile those factors. Those factors are then considered holistically and determine whether the complaint satisfies the high bar under the PSLRA and TELABS. That's exactly what Judge Anderson did. The crux of Appellant's argument is that the district court erred when it dismissed the complaint because it didn't review it holistically. Again, he can't find the smoking gun. He can't find facts, frankly, but we disagree with his analysis. Following the PSLRA, TELABS, and this court's precedent, the district court analyzed each misleading to determine whether the statement set forth a material misstatement or omission. The court then addressed the allegations to determine whether they stated with particularity the facts giving rise to a strong inference of scienter. The court considered these facts pled as a whole against the framework of Hellwig. Pages 594 to 600 in the record need to be read together because they set forth the court's complete holistic analysis. I want to focus on one set of facts, which I think your questions really hone in on. The key point here is really demonstrated by focusing on the Hellwig factor, focusing on the magnitude of the issue. Servicemaster disclosed existence of the termite damage claim at the outset of the class period in February, again in August, and then continuing through October and November. The public disclosures in February of 2019 provided EBITDA, which is a common measure of overall performance guidance, of $435 to $445 million. I guess something wasn't disclosed or something was a surprise to the market at some point because the stock price dropped, right? Let me put that in context, if I may, because that's exactly what I want to address. But again, in February you have the $435 to $445 for the full year. It discloses the existence of a potential termite damage claim and takes a $2 million expense. Again, it's a forecast, it's a projection. It's critical because termite claims and the liabilities that are recorded are based on estimates and methodology, there's a certain amount of predicting involved as opposed to hard numbers. Those methodologies were all disclosed in the financials. Now the October and November, to get to your question, the October and November press releases identified a roughly $10 million reduction in the forecast. They recorded a $2 million increase in terms of a charge relating to a termite claim. But the important fact that's not set forth in their brief that we focus on, there were a whole series of other factors that were disclosed in those releases in October and November. They identified other factors that contributed to lower third quarter results and to lower EBITDA forecasts. So there was additional investments of $6 million in growth, $4 million in spin-related disenergies, $4 million reduction driven by the outsourcing of fumigation completion services, and again, explaining the difference between the prior period third quarter results and that year's third quarter results. They talked about the benefit in the prior year of a $53 million one-time gain from discontinued operations. So the point here is that there were a whole series of facts that related to non-termite issues. Again, the termite issue was a $2 million change in the number, and then they were talking about a $10 million change in the overall year forecast, and that's as part of $430, $440 million in positive EBITDA. So the company's still doing great. So you have a little bit of a change in forecast. And so great that the stock dropped 40%. Well, again, there were other issues that contributed at that point in time to the stock. But now are you talking about loss causation as opposed to Center? No, I'm talking about the Helwig factor that focuses on the magnitude of the issue. And... It kind of ties in, I guess, in some ways to loss causation, but okay, yeah. It's both, but again, in terms of the Helwig factors and TELEBS and everything else, it's the magnitude. What about the fact, though, that the company raised rates as high as 1,000% trying to drive people in Mobile with contracts out of their contracts? Does that indicate Center fraud? The answer is no. And you'd ask a question of my colleague, you know, in terms of this is the Mobile, Alabama region, and the October and November press releases disclosed that that was one. One press release says 1% of revenues. One says it's 2% of revenues. So you need to put it in the context of the overall impact to the business. And the allegations with respect to the statements and pricing. So one, the court dismissed the allegations concerning transformation of the business as not being material misstatements. It left in the case the one misstatement that was alleged related to the May 7, 2019 pricing issue. And there the court concluded that the complaints, allegations surrounding De Lucente's statements lacked any context showing what facts were known to that individual at the time that he made that statement. The court went on that nothing in the complaint alleges when the company embarked on the drastic rate increases or shows that the policy in Alabama was actually the reason that Terminex enjoyed better pricing across all of the markets, as compared to this one very small market that we're dealing with here, where it operated in early 2019. So going back, going back to the other Hellwig factors again, the complaint, and this is the point that Judge Anderson made, it did not have citation or discussion of specific documents, internal reports that were inconsistent with the public disclosures that were being made throughout the time period. Although there was reference to internal meetings where termite issues were discussed, there was no detailed facts talking about information that was contrary to the disclosures that were being made. You look at the other Hellwig factors, there's no insider trading like the Aztec case that my colleague had mentioned. And that's why if you look at the body of Sixth Circuit opinions, this case is very, very different. You know, the, let me just highlight my cases here. Again, the Doshi case is a very good case. There's a situation where you have accounting regularities that lead to two restatements. Restatements mean that the financial statements were wrong. It's not a change in guidance or estimates. It's an actual misstatement. There you had theft in the Brazilian operations. The Dybald opinion alleged phony invoices and artificially inflated revenue. The Dana case involved a restatement. Again, the financial statements were wrong. They had to be corrected. The City of Monroe case that's cited in their brief talks about thousands of claims for tire defects and $500 million in losses. So once again, it's a very different case. Much bigger numbers and actual errors in the financial statements. Again, here you have a change in estimate. You have an evolution of estimates for claims as the claims are evolving. In terms of the Alabama, two other things I want to focus on. There's a declaration that was submitted in this case. That declaration was only submitted in connection with the motion for judgment in the pleadings. They seek to use it in terms of supporting the reversal of the motion to dismiss. It's not appropriately considered as part of it. What do we do with the Alabama investigation? Doesn't that show that at least there's some awareness that there's a problem, that you may need to reserve more? I mean, I take it that's the, their argument is, look, you have this investigation. You've got these arbitration awards. You've got a serious problem. An extra $2 million is just completely understating what the exposure is. Yeah, so there's a number of reasons why it does not support a claim for securities fraud. One, that investigation, that settlement dealt with consumer fraud, not securities fraud. Two, the investigation was settled approximately one year after the alleged corrective disclosures. But it was going on, right, during the class period? They don't allege facts. They cite to a press release. They say in their brief that the press release says it was going on during the period that press release, which is part of their declaration, which again came in on the motion for judgment in the pleadings, doesn't say that. So that's not in the record. No allegations in the complaint suggest that ServiceMaster actually quickly settled the investigation. Nothing in the complaint, their declaration, or otherwise establishes that the investigation was commenced. Yeah, we just touched on that. And the other fact is, again, there's a number of cases that are cited where large public companies are frequently the subject of investigations and the mere existence of a pending investigation is insufficient to give rise to a strong inference of scienter. That's the Dybald case, the Ashland case, and again, the cases that they cite in terms of investigations involved far more serious conduct, criminal conduct. This is not criminal conduct. Again, this is a consumer issue. So they have the Eastwood case where there's a criminal conspiracy to misappropriate Medicaid funds. There's the Greenfield case where someone was indicted by the grand jury for falsifying business records, grand larceny, and conspiracy. So again, this settlement that was entered into a year later. Yeah, I hear that, and I don't know. I suppose, I don't know that it matters that it was criminal or not criminal. I guess the point is, the question is, is it misleading? Are the statements misleading because, and can you infer that they were knowingly so, because again, there's this legal exposure that's out there. There's a serious problem with termite damage. We're facing increasing legal liability, and at the same time, we're telling the market, oh, you know, we're just going to, we've got some historical practices. We're going to, we're going to accrue 2 million more. You know, we're fine. And your honor, I think the hole in the record is any fact connecting that settlement in November of 22 to show that there were claims during the class period of February to November of, October, November of 2019, that there were actually claims of a greater magnitude that existed, that were known to senior members of management, and that were not disclosed. And where these estimates, where these claims had actually come to. I take it there, I thought they did allege that there were at least some arbitration awards that were in the seven figures that they were aware of. So, they identify in their complaint, and then they later attach the arbitrations in the declaration, three awards, which in total are less than 10 million dollars, and again, which evolve over that 2019 period. There's no allegation as to when they became final, but again, that 10 million is consistent with, you know, you've got the 2 million in the beginning of the year, you've got an additional 2 million in August, then you have another 2 million in October of November. So, you know, as Judge Anderson found correctly, the facts that are alleged are consistent with the inference, the plausible inference, and again, they didn't overcome, they didn't present a strong inference of fraud. You wouldn't reserve, okay, I've got 10 million in awards, I'm going to reserve 10. I mean, these are three cases, how many other cases, I mean, presumably, if this is an infestation in Mobile, Alabama, there's 50 cases, 100 cases. I don't, I mean, I don't know, the legal department would know that, right? It seems implausible that you would just say, well, okay, we have these three cases, it's 10 million, we'll reserve an extra 2, whatever it is, as opposed to saying, hey, there's got to be more where this came from. I mean, the magnitude of the award seems to be pretty high to me. I mean, it involves perhaps some punitive damages based on conduct, I don't know, but I mean, it just seems like it's, you could infer, perhaps, that there was more out there. And again, the judge made a determination there was not a strong inference, which, again, if you look at the facts in the complaint, there's nothing to show that there were reports that were provided to senior management, that there were discussions with senior management, that there were other facts that showed that other cases had come to a point where recognition of an increased charge or an increased reserve or a change to the estimates was actually required under the accounting standards. Which, frankly, it's probable and reasonably estimable. And there's nothing in terms of the factual record that shows there was contrary information presented to senior management during that period with respect to that claims. And in contrast, as Judge Anderson found, the more plausible inference was that management was being totally forward. They were disclosing the fact that starting in February that there were issues, disclosing the fact that they used estimates to determine what the right answer was. And as things went along and as claims came in, as arbitration awards were issued, they were increasing their reserves. And they got to that $10 million kind of hit at the end of the year that changed, again, the forecast. So it's an estimate. Okay. I'm out of time, unless you have any other questions. We appreciate your attention. Thank you. Council has indicated, you know, we need to look at the decision collectively and holistically like we would with respect to the actual Sienta analysis. So he spent a lot of time talking about what happened in February and what happened in May and what happened in August. And I think it's important to point out that the court found that we alleged false statements in February and we alleged the scheme in February. We alleged false statements in May and the scheme continued in May. We alleged the same for August. And when the truth came out in October and November and, you know, he spent a lot of time talking, I think, Judge, you hit the nail right on the head. When the bad news came out, all of the bad news related to what was going on in Alabama. They said we've had this significant problem going on there for years. Again, if you read the actual allegations of what our loss causation allegations are, but I think they're relevant to both Sienta and the falsity, that what they're telling you is we had this huge problem. We had to take these significant activities and mitigating actions. We took them only in Alabama. We didn't take them anywhere else. And what happened? The market reacted negatively. The stock dropped 20% in October. Analysts came out and said, what are you guys talking about? You've never disclosed anything about this big problem you have in Alabama at any time before, even, and then, you know, they took the, they did take $2 million charges in each one of those. The court specifically found those weren't sufficient in the sense that they didn't say anything about what was going on in Alabama. It was just a generic, I think he called it a general statement about something going on in the Gulf Coast. Well, that doesn't really inform investors about what was going on. You know, what we say, and facts have to be taken as true here because we're still at the pleading stage, was this huge problem that was going on in Alabama. And I'll just finish by reading something that one of the arbitrators said in one of the arbitration decisions, said there's no basis to any assertion that the top officials did not know of the vast volume of claims made or the extent of the damage involved. That's our scienter in a nutshell, in that we allege it was this huge problem. Again, it is a circumstantial case, but I think it's on line with what this court held in Frank V. Dana. We allege other circuit decisions, I think, are similar. The First Circuit Carbonite case, which was from 2021, the Third Circuit Avaya case. Avaya specifically held that they pled scienter even though there was no document or witness that specifically discussed anything with the defendants. And again, I'll just, with my last couple seconds, we have a corporate scienter argument here that we allege that the district court didn't even address. He only addressed scienter as to the individual defendants and said, well, since there's no scienter for them, that's the end of the story. But under this court's decision in Omnicare, you can look at the scienter of other executives and we allege a number of executives in the complaint that had knowledge. They were involved in the claims handling. We specifically identified Mr. Stevenson, the president of Terminix Residential, who was heavily involved in what was going on. And we believe his scienter can be imputed to the company for scienter purposes. And unless there's any questions, we ask that the court reverse the decision. All right. Thank you for your argument. Thank you. Thank you to both counsel for those helpful arguments. And the clerk may call the next case.